# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

AIMEE GAUTHIER,

       Plaintiff,

vs.

WATERLOO COMMUNITY SCHOOL
DISTRICT and
KATHY KONIGSMARK,

       Defendants.

No. C05-2070

**ORDER**

_____

## TABLE OF CONTENTS

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.  STATEMENT OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
     A.  Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . 16
     B.  Exhaustion Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
     C.  Disability Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
     D.  Hostile Work Environment  . . . . . . . . . . . . . . . . . . . . . . . . . . 22
     E.  Retaliation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
     F.  Defendant Konigsmark's Individual Liability Under ICRA  . . . . . . . . . 25

This matter comes before the court pursuant to defendants' November 13, 2006 Motion for Summary Judgment (docket number 16).  The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

# I. INTRODUCTION

In her Amended and Substituted Complaint (docket number 11),[1] plaintiff Aimee Gauthier, asserts claims of disparate treatment, harassment and retaliation on the basis of disability in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. and the Iowa Civil Rights Act ("ICRA"), Iowa Code Chapter 216 against Waterloo Community School District ("WCSD"); and against Defendant Kathy Konigsmark for disparate treatment, harassment and retaliation on the basis of disability in violation of the ICRA.

Defendant WCSD moves for summary judgment as to Ms. Gauthier's claims for disparate treatment and retaliation arising from actions allegedly taken before June 28, 2003 under the ADA and before October 26, 2003 under the ICRA because Ms. Gauthier failed to exhaust her administrative remedies and such claims are barred by limitations.

Defendant Konigsmark moves for summary judgment as to: (1) Ms. Gauthier's claims for disparate treatment and retaliation arising from actions allegedly taken before October 26, 2003 under the ICRA because Ms. Gauthier failed to exhaust her administrative remedies and such claims are barred by limitations; (2) Ms. Gauthier's claims against her under the ICRA as Defendant Konigsmark is not subject to individual liability under the Act; and (3) Any alleged acts of disparate treatment that allegedly took place after the end of the 2003-04 school year as Defendant Konigsmark had no involvement in any such alleged violation.

Both defendants move for summary judgment as to: (1) All of Ms. Gauthier's claims under the ADA and the ICRA because she cannot make a prima facie showing of disability discrimination; and (2) Ms. Gauthier's disparate treatment and retaliation claims

---

[1] This court previously dismissed Plaintiff Gauthier's claim under the ADA against defendant Konigsmark in her individual capacity, Ms. Gauthier's claim for intentional infliction of emotional distress, and Ms. Gauthier's claims for punitive damages under Counts I, II, and IV of her October 6, 2005 Complaint (docket number 2).

under the ADA and the ICRA as there was a legitimate, non-pretextual reason for each alleged act of discrimination or retaliation.

Defendants' motion for summary judgment is granted.

## II.  STATEMENT OF MATERIAL FACTS[2]

Defendant WCSD is a school district organized and existing under the laws of the state of Iowa with its administrative offices in Waterloo, Black Hawk County, Iowa. Defendant Konigsmark resided in Waterloo, Black Hawk County, Iowa at all material times and was employed by WCSD.  Ms. Konigsmark received her B.A. in Elementary Education from the University of Northern Iowa in May 1981 and was awarded her Master of Arts degree in Education by the University of Northern Iowa in May 1988. Ms. Konigsmark received her Teacher Certificate as a K-9 teacher from the Iowa Board of Educational Examiners on July 1, 1981 and was first licensed as an elementary principal by the Iowa Board of Educational Examiners on September 16, 1988.

Plaintiff Gauthier resided in Waterloo, Black Hawk County, Iowa at all material times and was employed by the WCSD as a teacher.  Ms. Gauthier is a white female, born on October 9, 1973, who suffers from a visual impairment in that she has been legally blind since her early childhood.  Her visual impairment substantially limits one or more major life activities.  Ms. Gauthier is otherwise qualified to perform the essential functions of her job as a teacher.

Ms. Gauthier graduated from the University of Northern Iowa in December 1999 with a bachelor of arts degree in Teaching English to Speakers of Other Languages.  On December 28, 1999, she received an Initial License from the Iowa Board of Educational Examiners authorizing her to serve as a K-12 ESL (English as a Second Language) teacher with an expiration date of August 31, 2002.

---

[2] This section contains the undisputed facts contained in all parties' Statements of Material Facts submitted to the court.  Where disputed, the facts are set forth in the light most favorable to Ms. Gauthier as the nonmoving party.

On November 19, 2001, WCSD reassigned Ms. Konigsmark from her position as a teacher at Edison Elementary School to be principal at Kittrell. Ms. Konigsmark served as principal at Kittrell for the 2002-03, 2003-04, and 2004-05 school years.

<u>2001-2002 School Year</u>

WCSD hired Ms. Gauthier for the 2001-02 school year as a kindergarten ESL teacher at Kittrell Elementary School. At the beginning of the 2001-02 school year, WCSD assigned a mentor to assist Ms. Gauthier for a two-year period in order to comply with prospective requirements of the Iowa State Board of Education for obtaining licensure beyond provisional status.

In late February 2002, Ms. Konigsmark arranged a meeting with herself, Ms. Gauthier, and Patrick Clancy, the Associate Superintendent for Student and Supplemental Services for WCSD. At the meeting, Ms. Konigsmark expressed concern that plaintiff's vision problems may have played a part in failing to appropriately deal with a playground incident and a classroom incident. Ms. Gauthier denied that her vision was a factor in either incident. Ms. Konigsmark then told Ms. Gauthier that she needed to know the extent to which Ms. Gauthier could see. She stated that she herself had always had to use her full vision to monitor the classroom and did not understand how Ms. Gauthier could monitor the classroom with impaired vision. Mr. Clancy then asked Ms. Gauthier if she needed any accommodation which Ms. Gauthier declined. Ms. Gauthier told Ms. Konigsmark that she used other environmental cues to monitor the classroom. Ms. Konigsmark told Ms. Gauthier that she still needed to have effective classroom management. The meeting ended with the understanding that Ms. Gauthier was to contact Mr. Clancy whenever she needed any accommodations. When Ms. Gauthier talked to Ms. Konigsmark the next day, she told Ms. Konigsmark that if she had any other questions regarding Ms. Gauthier's vision that Ms. Gauthier would have a representative from the Iowa Department for the Blind present. Ms. Konigsmark did not bring the subject up again.

In the spring of 2002, Ms. Gauthier turned in a paper that was written without her adaptive equipment, and Ms. Konigsmark told her "that Ms. Gauthier's student had really good writing for a kindergartner." Ms. Gauthier then told Ms. Konigsmark that it was her writing, whereupon Ms. Konigsmark laughed and said it "looked like one of her student's writing" and showed it to another person.

<u>2002-2003 School Year</u>

During the 2002-03 school year, WCSD employed Ms. Gauthier as an ELL (English Language Learner, formerly ESL) resource teacher at Kittrell.

In the fall of 2002, the teachers at Kittrell were required to watch a video. Later, Ms. Gauthier got a note from Ms. Konigsmark saying that she needed to see the video. Ms. Gauthier told Ms. Konigsmark that she had already watched the video. Ms. Konigsmark then looked at the sign-in sheet and asked Ms. Gauthier if her name was on it. Ms. Gauthier couldn't see to read the sheet, and Ms. Konigsmark said that she could not make out the signature because it was really messy. Ms. Gauthier "felt embarrassed and inadequate."

In November of 2002, WCSD provided certain software to Ms. Gauthier that she had requested as an accommodation. Ms. Konigsmark asked Ms. Gauthier how things were working with the software, and Ms. Gauthier told her that it was working fine. Ms. Konigsmark then went on to tell Ms. Gauthier that if Ms. Gauthier ever needed anything else because of her vision, that she was to go to Ms. Konigsmark immediately because she did not want Ms. Gauthier's vision to be an excuse for her not passing her upcoming evaluation.

In February of 2003, Ms. Gauthier and another fourth grade teacher were monitoring their classes on the playground when the other teacher was called into the building. Ms. Gauthier felt uncomfortable being the only adult on the playground, but could not go into the building to get another adult because she could not leave the students unsupervised. Ms. Gauthier decided to line the students up and get them back into the building. One of the students disregarded her instructions to get in line. Ms. Gauthier told

the student that he would have to sit at the time-out table for lunch that day, but when Ms. Gauthier explained the situation to Ms. Konigsmark, Ms. Konigsmark rescinded the order and told the student he would not have to sit at the time-out table. Ms. Gauthier felt that this was "very demeaning" and that Ms. Konigsmark "showed an extreme lack of respect." Ms. Gauthier then told Ms. Konigsmark that she felt uncomfortable being left alone on the playground, and Ms. Konigsmark told her that "as an adaptation because of her vision, she would not be out there alone anymore." Ms. Gauthier "felt very belittled and treated extremely unprofessionally" because it was standard procedure, rather than an accommodation, to have two adults on playground duty at all times.

On March 12, 2003, Ms. Gauthier met with Ms. Konigsmark to review her final Iowa Teaching Standards evaluation. Ms. Konigsmark informed Ms. Gauthier that she was going to recommend that she receive a third year of mentoring, even though Ms. Gauthier had met all of the applicable standards and criteria. Ms. Konigsmark indicated that Ms. Gauthier had received a lot of support and she felt that Ms. Gauthier needed another year of support. Ms. Gauthier refused to sign the mentoring recommendation and asked for a copy of her evaluation. Ms. Konigsmark refused to give her a copy, but signed a written statement indicating that Ms. Gauthier had passed her standards.

Ms. Konigsmark contacted a district official and, later that same afternoon, informed Ms. Gauthier that a third year of mentoring would not follow district procedure and she would recommend her for standard licensure.[3] Ms. Gauthier believed that

---

[3] Ms. Gauthier's fellow teacher described the exchange, in relevant part, as follows:
   . . . Miss Konigsmark exploded into the room and barked, "Amy I have been trying to get a hold of you. Where have you been? I called Greenbrier, I left a message at your house, no one was answering here at school so I came back. I just about went to your house." Not giving Amy a second to answer[,] she continued to snap, "I made a mistake. If someone passes the Standards they can not be recommended

(continued...)

Ms. Konigsmark's initial plan to recommend a third year of mentoring was based on Plaintiff's visual impairment and that Ms. Konigsmark had treated her in an "unnecessarily abrupt and very forceful" manner that Ms. Gauthier found to be "very demeaning" and "very unprofessional." When Ms. Gauthier signed her final evaluation, Ms. Konigsmark pointed to the line where Ms. Gauthier needed to sign and Ms. Gauthier signed, but not perfectly on the line. Ms. Konigsmark said, "[O]h[,] that is how you sign your name" in a manner that Ms. Gauthier took to be "mocking." Ms. Gauthier felt embarrassed and that it was rude and unnecessary for Ms. Konigsmark even to mention the way she signed her name.

On March 19, 2003, Ms. Gauthier received a Standard License from the Iowa Board of Educational Examiners authorizing her to serve as a K-12 ESL teacher with an expiration date of October 31, 2008. At all material times, Ms. Gauthier's licensure was limited to teaching ESL/ELL students, and she was never licensed to teach math or reading.

On April 1, 2003, Ms. Gauthier filed a written complaint of discrimination pursuant to the District's anti-discrimination policy. In her Complaint Form, Ms. Gauthier alleged that she had been discriminated against on the basis of disability in violation of district policy by Ms. Konigsmark on March 12, 2003 as follows:

> Description of misconduct/violation[]: Refused to give a signed copy of my evaluation. Also, talked to me in a very demeaning manner. During the eval[uation], [she] made demeaning remarks [about] my visual impairment.
>
> * * *

---

[3](...continued)
> for a third year so come sign this now." Again not giving her an opportunity to respond[,] she ordered her to the office saying, "In my office, now! Sign this. Come on." With that they both left the room. Ms. Konigsmark's entire demeanor was hostile, belittling and demeaning.

Plaintiff's Exhibit 4.

> Evidence of misconduct[]: Mary Beth Kirk was in the room
> when I was spoken to unprofessionally and Kathy Konigsmark
> refused to give me a copy of my eval[uation] – I asked 3
> times.
> Any other information[]: attached and sent to Mr. White.
> Remedy Sought: (no answer given).

WCSD Complaint Form, Defendants' Appendix 104-105.

On July 3, 2003, WCSD's Associate Superintendent for Human Resources, Dr. Beverly A. Smith, sent Ms. Gauthier a letter concerning her investigation of Ms. Gauthier's discrimination complaint which stated:

> I have completed the investigation of the harassment complaint
> you filed against Ms. Kathy Konigsmark.  In the course of this
> investigation it became obvious that serious communication
> problems exist in the building.  It is also apparent that staff
> morale issues in the building may have exacerbated your
> complaint.
>
> Although Ms. Konigsmark's interactions with you were not
> intended to intimidate, demean, or offend, it is apparent that
> you did feel mistreated because of Ms. Konigsmark's remarks
> and actions related to your visual impairment.  The District is
> committed to providing a respectful environment that is free
> from hostility and intimidation.  This expectation has been
> addressed with Ms. Konigsmark.  The District will continue to
> take measures to increase awareness of and sensitivity to
> equitable treatment for all.
>
> If in the future you believe that you have been subjected to
> intimidating, demeaning, or offensive behavior or comments
> please address the issue first with Ms. Konigsmark.  If you do
> not believe that you have satisfactorily resolved the incident at
> that level or if you are not comfortable addressing the issue
> with Ms. Konigsmark, please contact Mr. Patrick Clancy.
>
> Your willingness to make us aware of your concern is
> appreciated.  It is the goal of our District that students and
> staff are treated with dignity and respect.  On behalf of the
> District we are sorry that you experienced workplace actions
> that fell short of this goal.

Dr. Smith letter, Defendants' Appendix 109.

<u>2003-2004 School Year</u>

During the 2003-04 school year, WCSD employed Gauthier to teach 4th grade ELL and regular education students at Kittrell and employed Ms. Konigsmark as the elementary school principal. Following her initial complaint, Ms. Gauthier testified as to a number of incidents during which she feels Ms. Konigsmark belittled her and attacked her professionalism in front of her students or fellow teachers.

On October 1, 2003, Ms. Gauthier referred a student to Ms. Konigsmark for discipline after an associate had reported to Ms. Gauthier that the student had been disrespectful during recess. Ms. Konigsmark removed the student from the classroom and returned him 15 minutes later with the remark that the student had not done anything wrong.

Two days later, Ms. Konigsmark called Ms. Gauthier into her office and told her in the presence of an associate that Ms. Gauthier had misunderstood the disciplinary plan for the student involved in the recess incident. Ms. Gauthier, however, was very sure that she had understood the plan.

On October 8, 2003, Ms. Konigsmark told the Ms. Gauthier that she was moving a student from Ms. Gauthier's classroom to Ms. Banford's room effective the next day. Ms. Gauthier then went to Ms. Banford's room and found that Ms. Konigsmark had informed Ms. Banford of the transfer much earlier in the day and that she had already met with the parent at Ms. Konigsmark's direction. Later that afternoon, Ms. Konigsmark called Ms. Gauthier into her office and told her that the transfer had been rescinded.

In October of 2003, one of Ms. Gauthier's students threw a marker at another student and hit her in the face during class. When Ms. Gauthier sent the disruptive student to the office, Ms. Konigsmark told her that she should not have done so.

In October of 2003, Ms. Gauthier had a student sit next to her during an assembly to work on his spelling. During the assembly Ms. Konigsmark told Ms. Gauthier that the student should not be working on his spelling during the assembly, and that she should

have sent him to the office to work on it. It was Ms. Gauthier's understanding that Ms. Konigsmark had told her earlier in the day that she was not to send students to the office.

On November 10, 2003, Ms. Gauthier was called out of her classroom to go to Ms. Konigsmark's office. When Ms. Gauthier got to the office, she had to wait five minutes before seeing Ms. Konigsmark. Ms. Konigsmark then told Ms. Gauthier that she had not handled a situation professionally when she called a student's parents to inform them that his misbehavior was being documented. On November 21, 2003, Ms. Konigsmark entered the computer lab while Ms. Gauthier had her class in the lab writing reports about personal experiences. While she was in the lab, Ms. Konigsmark noticed one of the students writing about a suspension that had been imposed upon him. Ms. Konigsmark then asked Ms. Gauthier to step outside the computer lab and told her that she did not think that the student was an appropriate topic. When Ms. Gauthier disagreed, Ms. Konigsmark became angry and grabbed Ms. Gauthier by the sleeve of her sweatshirt to pull her over and continue to argue about the student's choice of paper topic.

On December 19, 2003, Ms. Konigsmark was holding class meetings in Ms. Gauthier's room as part of control theory. When the students became restless waiting for Ms. Konigsmark to begin, Ms. Gauthier told one of the students to sit by her. When she did so, Ms. Konigsmark said that she was in charge and countermanded Ms. Gauthier's directions. When the lesson was almost finished, the same student became disruptive again, and Ms. Konigsmark became angry and told the student to go to the office. When the student refused to go, Ms. Konigsmark allowed him to remain.

On January 14, 2004, Ms. Gauthier observed that a student was getting ready to throw a potentially dangerous object at someone. Ms. Gauthier sent the student to Ms. Konigsmark's office. Ms. Konigsmark returned with the student and directed Ms. Gauthier to call the student's parents to let them know of the incident. However, there was a confrontation between Ms. Konigsmark and the student before the student sat down, and Ms. Konigsmark ended up taking the student back to the office and suspending

him.  Ms. Gauthier believed that Ms. Konigsmark inappropriately suspended the student for his confrontation with Ms. Konigsmark rather than for his threat to throw the object at someone.  On January 15, 2004, Ms. Konigsmark told Ms. Gauthier never to talk to any of the parents of her students without Ms. Konigsmark or another person present.

On January 20, 2004, Ms. Gauthier met with Ms. Konigsmark, WCSD Superintendent Dr. DeWitt Jones, and teachers' association representative Elwood Thompson.  Dr. Jones indicated that he was present at the meeting for the purpose of evaluating Ms. Konigsmark.  Ms. Konigsmark brought up concerns that she had about Ms. Gauthier's lack of participation in a meeting the previous spring and Ms. Gauthier quitting a class that she was taking outside of her contractual obligation.  Ms. Gauthier was "shocked" because the association representative had told her that the purpose of the meeting was for Ms. Gauthier to have some of her concerns addressed.  Ms. Gauthier responded that she appeared not to be participating in the meeting because she had made accommodations to view the materials at home using her adaptive equipment, and that she had dropped out of the class because of illness.  Ms. Gauthier believed that Ms. Konigsmark brought up these incidents for the first time at the meeting in retaliation for the complaint of discrimination that Ms. Gauthier had filed the previous year, and that "the worst part is that the superintendent of schools allowed Ms. Konigsmark to do this." Ms. Gauthier felt "very unsupported and singled out."

On January 21, 2004, Ms. Konigsmark told Ms. Gauthier's interpreter that it would be okay for her to leave Ms. Gauthier's room as long as there was another adult in there with Ms. Gauthier, even though Ms. Gauthier had not asked for any such assistance and did not feel that there was any need for another adult to be in the room with her at all times.

On April 23, 2004, Gauthier filed a Complaint of Discrimination under Iowa Code Chapter 216 with the Iowa Civil Rights Commission ("ICRC") that was cross-filed with the Equal Employment Opportunity Commission ("EEOC").  In her Complaint, Gauthier alleged that she was discriminated against by WCSD on the basis of physical disability and

retaliation. Gauthier's Complaint identified Kathy Konigsmark, administration/principal, as the person at WCSD who discriminated against her and harassed her. Gauthier's Complaint stated that the last date that something discriminatory happened to her was January 20, 2004.

Gauthier's Complaint set forth the following particulars of discrimination:

On January 20, 2004, I was told to attend a meeting concerning some issues regarding problems I was having with Miss Konigsmark. In the meeting, I was inappropriately questioned about my participation, or ability to participate in meetings due to my visual impairment. However, I had made accommodations for myself in both meetings in question. Since Feb. 2001, I have been discriminated against due to my disability. I have, in March of 2002 [sic], filed a complaint, however, this harassment and discrimination has not ended. My work environment is extremely hostile. I feel belittled and treated very unprofessionally.

ICRC Complaint Form, at 3-4, Defendants' Appendix at 112-113.

Gauthier's responses to the ICRC's questionnaire included as follows:

7. What do you want to happen as the result of filing your complaint?
Answer: I have already filed a complaint with the Waterloo School District. I would expect Miss Konigsmark to end this and I feel there should be reprimanded (sic) for her actions.
* * *
DISABILITY
* * *
6. Did you request an accommodation from your employer? If so, from whom did you make this request and on what date? What accommodation(s) did you request?
Answer: Mr. Clancy, head of special needs, allowed me to order a computer program in the fall of 2002. Other than that, I make my own adaptations.
7. What was the response from your employer? Be specific in your description of the response.
Answer: Purchased the program.
RETALIATION
1. Prior to the alleged retaliation did you:

a) File a previous charge of discrimination against the Respondent? If yes, give date and CP#. With whom did you file the charge?

Answer: Yes I filed through the Waterloo School District.

b) Assist, witness, or testify in someone else's charge of discrimination? If so, explain. Include dates and names of the persons involved.

Answer: No.

c) Oppose a discriminatory act or refuse to participate in discriminatory activity occurring in the work place? Explain.

Answer: No.

2. If you did not file a prior complaint, or participate in any of the above, had you complained internally or informally about discrimination in your workplace? If so, explain.

a) To whom did you complain? Give dates, names and position titles.

Answer: I filed a formal complaint with the Waterloo School District.

b) Was your complaint written or oral? If written, include copies of all paperwork.

Answer: Formal and in writing.

c) What, specifically, did you complain about?

Answer: Discrimination based on my visual impairment.

d) What response did the Respondent make to your internal complaint?

Answer: A letter back stating it was not intended and it wouldn't happen again.

* * *

4. How were you retaliated against for your involvement in any of the above? In other words, what happened to you as a result of your involvement? Be specific. Include dates, names, and position titles of all persons involved.

Answer: I received very unprofessional treatment and the items I had filed a complaint about continued. Matters got much worse.

5. Why do you believe your participation in a civil rights proceeding or opposition to discrimination was a factor in the way you were treated? Would these things have happened to you if you had not participated in any of the above? Explain.

Answer: (none given)

6. Were you treated differently than other persons who did not participate in a civil rights proceeding or oppose a discriminatory act? If so, please explain.

Answer: (none given)

HARASSMENT

1. Identify the harassers by name, position, disability, and work-place relationship to you.

Answer: Miss Kathy Konigsmark, Principal (my boss).

2. List the specific instances of the alleged harassment. Include dates on which the conduct occurred, and if the conduct occurred more than once, indicate the frequency with which it occurred.

Answer: (none given)

3. Why do you think the alleged harassers engaged in this conduct toward you? Explain.

Answer: I feel Miss Konigsmark does not feel I can do my job because of my visual impairment, however, I can do my job and have met all 8 Iowa Teaching Standards.

* * *

6. Does the Respondent have an anti-harassment policy? Yes _X_ No ___

Answer: The District has a policy against harassment.

7. Did you complain about the harassment to anyone within the company? Yes _X_ No ___. To whom? Their position? When?

Answer: Filed a complaint.

8. Was any action taken because of your complaint?

Answer: Yes, they said it wasn't intended and it would stop.

11. If there have been other incidents or actions that you believe indicate bias or discrimination by your employer or supervisor, please describe those actions.

Answer: (none given)

ICRC Questionnaire, Appendix at 115-119.

The ICRC notified WCSD of the filing of Ms. Gauthier's complaint by certified letter dated May 11, 2004 and received by WCSD on May 13, 2004.

<u>2004-2005 School Year</u>

For the 2004-05 school year, Ms. Gauthier was transferred to Jewett Elementary School as an ELL teacher. Ms. Gauthier believes this was done in retaliation for having

raised a complaint against her principal. The principal at Jewett during the 2004-05 and 2005-06 school years was Liz Kilgard.

On July 19, 2005, the ICRC issued an Administrative Release (Letter of Right-To-Sue) to Ms. Gauthier. On August 3, 2005, the EEOC issued a Notice of Right to Sue to Ms. Gauthier.

<u>2005-2006 School Year</u>

On October 6, 2005, Ms. Gauthier filed her Complaint in this court. On October 28, 2005, WCSD transferred Ms. Konigsmark from her duties as principal at Kittrell to an assignment as Co-Principal at Lincoln and Lou Henry Elementary Schools.

On December 13, 2005, ELL Facilitator Jeanne I. Angel, Ph.D., denied Ms. Gauthier's request to attend a two-day professional development workshop. Dr. Angel replied to Ms. Gauthier's request as follows:

> I'm sorry but I will not be able to send you to the ICLC after all because you have been absent several times this year already. Since we don't provide a sub for you when you are out, this means that he ELL students don't get any services when you are gone. This conference would add 2 more days without service for them.
> Perhaps you will be able to attend next year.

Defendants' Appendix at 52.

In February of 2006, Ms. Gauthier attempted to arrange for a substitute while she went to her doctor. Through an error or misunderstanding, Ms. Gauthier was recorded as a "no call, no show" for that time and was told that she would have her pay for the day deducted from her next check. When Ms. Gauthier contacted a WCSD administrator to explain the matter, the record was corrected and Ms. Gauthier's pay was not deducted. Ms. Gauthier felt that this was "yet another way to attack her professionalism and additional retaliation for the fact that Ms. Gauthier has complained about discrimination and that she has filed this lawsuit." Ms. Gauthier feels "like she must watch every move she makes so that she will not be set up to compromise her professionalism."

In March of 2006, Ms. Gauthier attended a professional development meeting. During the course of the meeting, another teacher whispered the contents of a page to Ms. Gauthier when Jewett Principal Liz Kilgard, who was sitting at the next table, said in a child's voice "[N]ow let's read like big people in our inside voices!"  The other teacher then turned to Principal Kilgard and said that she was reading to Ms. Gauthier, but Principal Kilgard did not respond or acknowledge that her comment was a mistake.

<u>2006-2007 School Year</u>

For the 2006-07 school year, Ms. Gauthier accepted an assignment to Irving Elementary School as an ELL teacher due to continued budgetary limitations and reduction in staff within the district.

At her deposition on October 16, 2006, Ms. Gauthier testified: (1) WCSD has never denied any accommodation that she has requested; (2) She has no evidence that she's been treated any differently than anyone else in her position at WCSD with respect to wages and benefits; (3) She never filed a grievance regarding any teaching assignment that she had been given by WCSD; (4) Other teachers were unhappy with Ms. Konigsmark because of her "snap decisions" and "not thinking about things and not following through."; (5) Other people complained about Ms. Konigsmark's decision-making, and the things that Ms. Konigsmark consistently did throughout the building "was just bad principalship."; and (6) After Ms. Konigsmark had directed her not to talk to parents without either Ms. Konigsmark or another person present, she contacted Patrick Clancy as suggested in Dr. Smith's letter of July 3, 2003, and Mr. Clancy countermanded Ms. Konigsmark's order.

### III.  CONCLUSIONS OF LAW

#### A.  Summary Judgment Standard

A motion for summary judgment may be granted only if, after examining all of the evidence in the light most favorable to the nonmoving party, the court finds that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  <u>Kegel v. Runnels</u>, 793 F.2d 924, 926 (8th Cir. 1986).  Once the movant

has properly supported its motion, the nonmovant "may not rest upon the mere allegations or denials of [its] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "To preclude the entry of summary judgment, the nonmovant must show that, on an element essential to [its] case and on which it will bear the burden of proof at trial, there are genuine issues of material fact." Noll v. Petrovsky, 828 F.2d 461, 462 (8th Cir. 1987) (citing Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Although "direct proof is not required to create a jury question, . . . to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985) (quoting Impro Prod., Inc. v. Herrick, 715 F.2d 1267, 1272 (8th Cir. 1983)).

The nonmoving party is entitled to all reasonable inferences that can be drawn from the evidence without resort to speculation. Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1110 (8th Cir. 2001). The mere existence of a scintilla of evidence in support of Ms. Gauthier's position will be insufficient; there must be evidence on which the jury could reasonably find for Ms. Gauthier. Id. The standard for Ms. Gauthier to survive summary judgment requires only that Ms. Gauthier adduce enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive, even if that evidence did not directly contradict or disprove defendant's articulated reasons for its actions. O'Bryan v. KTIV Television, 64 F.3d 1188, 1192 (8th Cir. 1995). Although it has been stated that summary judgment should seldom be granted in employment discrimination cases, summary judgment is proper should Ms. Gauthier fail to establish a factual dispute on an essential element of her case. Helfter v. UPS, Inc., 115 F.3d 613, 615-16 (8th Cir. 1997).

## B. Exhaustion Requirement

Defendant WCSD asserts that Ms. Gauthier's ADA claims arising from actions allegedly taken before June 28, 2003 and her ICRA claims arising from actions allegedly taken before October 26, 2003 are time-barred under both statutes because she failed to

exhaust her administrative remedies with respect to these claims. Defendant Konigsmark also asserts that Ms. Gauthier's ICRA claims arising from actions allegedly taken before October 26, 2003 are time-barred.

Ms. Gauthier filed her complaint with ICRC on April 23, 2004 and her complaint was then cross-filed with the EEOC. As such, defendants contend that her claims are limited to those occurring within 300 days of filing under the ADA and 180 days of filing under the ICRA. See National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002) (Supreme Court notes that "[a] claim is time barred if it is not filed within these time limits.").

Ms. Gauthier responds that her claims involve allegations of hostile work environments, as well as disparate treatment, and that "[a]ll of the incidents that have given rise to [her] complaints are interrelated and none are truly 'discrete' incidents." Plaintiff's Brief at 4. Ms. Gauthier further argues that her claims "are related in such a way that her entire claim can by analyzed as one of hostile work environment." Id.

Defendants assert that Ms. Gauthier misconstrues the difference between discrete discriminatory acts or disparate treatment and hostile work environment, pointing to the Supreme Court's analysis in Morgan:

> We derive several principles from these cases. First, discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

Id. at 113.

This court agrees and finds that those alleged discriminatory acts that occurred prior to June 28, 2003 are time-barred except to the extent that they are used in support of Ms. Gauthier's claim regarding hostile work environment.

### C. Disability Discrimination

The ADA forbids employers from discriminating against an otherwise qualified employee with a disability, because of that disability. 42 U.S.C. § 12112(a); Pedigo v. P.A.M. Transport, Inc., 60 F.3d 1300 (8th Cir. 1995). A qualified individual with a disability is a person with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position. 42 U.S.C. § 12111(8). ICRA disability discrimination claims are analyzed the same as ADA claims. Simpson v. Des Moines Water Works, 425 F.3d 538, 542 n.3 (8th Cir. 2005).

In order to prove disability discrimination, Ms. Gauthier may present direct or indirect evidence. The Eighth Circuit defines "'direct evidence' as evidence raising an inference 'that the adverse action was more likely than not based on a discriminatory criterion illegal under federal law.'" Napreljac v. John Q. Hammons Hotels, Inc., 461 F. Supp. 2d 981 (S.D. Iowa 2006)(internal citations omitted).

Where there is no evidence of direct discrimination, the familiar McDonnell Douglas burden-shifting analysis applies to determine whether indirect evidence proves disability discrimination. Texas Dept. of Comm. Affairs v. Burdine, 450 U.S. 248, 252, 53 (1981) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)).

There are three steps under the McDonnell Douglas indirect evidence framework: (1) prima facie case; (2) nondiscriminatory reason by the employer; and (3) pretext. Id. To establish a prima facie case of employment discrimination under the ADA and ICRA, Ms. Gauthier must show that she (1) was "disabled" under the ADA; (2) was qualified to perform the essential functions of her job with or without a reasonable accommodation, and (3) suffered an adverse employment action because of her disability. Thompson v. Bi-State Development Agency, 463 F.3d 821, 825 (8th Cir. 2006).

Should Ms. Gauthier establish a prima facie case, a rebuttable presumption of discrimination then attaches and the burden shifts to the employer to articulate some "legitimate, nondiscriminatory reason for its action." Price v. S-B Power Tool, 75 F.3d 362, 365 (8th Cir. 1996), cert. denied, 117 S. Ct. 274 (1996) (citing Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981)). Once an employer comes forward with such a reason, the presumption is rebutted and "the burden shifts back to Ms. Gauthier to prove that the defendant's proffered reason is pretextual and that intentional discrimination was the true reason for the defendant's actions." Price, 75 F.3d at 365. At all times, Ms. Gauthier retains the burden of persuading the trier of fact that she has been the victim of discrimination. Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir. 1995).

Applying this framework to this case, the court must determine whether Ms. Gauthier has established her prima facie case of disability discrimination. Both parties agree that Ms. Gauthier satisfies the first two elements of her prima facie case. The issue here is whether she suffered an adverse employment action because of her disability.

Ms. Gauthier alleges that WCSD "intentionally discriminated against [her] because of her disability by subjecting her to different terms and conditions of employment than the terms and conditions of employment enjoyed by non-visually impaired employees." Plaintiff's Amended and Substituted Complaint at 3. The defendants assert that Gauthier did not suffer an adverse employment action, stating that "[t]he record is totally of evidence that WCSD ever did anything that affected [Ms. Gauthier's] pay or benefits, or that it ever denied or even delatyed any requested adaptation or accommodation for [her] visual impairment." Defendants' Brief at 8.

> "An adverse employment action is one that causes a material change in the terms or conditions of employment." *717 Brown v. Lester E. Cox Med. Ctrs., 286 F.3d 1040, 1045 (8th Cir. 2002) (citations omitted). To be "adverse," the action "need not always involve termination or even a decrease in benefits or pay." Phillips v. Collings, 256 F.3d 843, 847 (8th Cir. 2001). However, "not everything that makes an

employee unhappy is an actionable adverse action."
Montandon v. Farmland Industries, Inc., 116 F.3d 355, 359
(8th Cir. 1997) (discussing an unlawful retaliation claim in the
context of Title VII) (citations omitted). Thus, "a transfer
from one job to another is not an adverse employment action
if it involves only minor changes in the employee's workings
conditions with no reduction in pay or benefits." Brown, 286
F.3d at 1045 (citing Ledergerber v. Stangler, 122 F.3d 1142,
1144 (8th Cir. 1997)).

Fenney v. Dakota, Minnesota & Eastern R. Co., 327 F.3d 707, 716 -717 (8th Cir. 2003).

"'Mere inconvenience without any decrease in title, salary, or benefits' or that results only
in minor changes in working conditions does not meet this standard." Wedow v. City of
Kansas City, Mo., 442 F.3d 661, 671 (8th Cir. 2006) (citing Sallis v. Univ. of Minn., 408
F.3d 470, 476 (8th Cir. 2005)). Ms. Gauthier must demonstrate a "'specific link between
the alleged discriminatory animus and the challenged decision'" such that a reasonable
factfinder could conclude that her disability provided the impetus for the adverse
employment action. Simpson v. Des Moines Water Works, 425 F.3d 538, 542 (8th Cir.
2005) (quoting Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004)).

Ms. Gauthier details numerous incidents that she alleges rise to the level of adverse
employment action: (1) Ms. Konigsmark attempted to subject Ms. Gauthier to a 3rd year
of mentoring even though Ms. Gauthier had passed all relevant standards;
(2) Ms. Konigsmark "grabbed the sleeve of the sweatshirt [Ms. Gauthier] was wearing and
pulled [Ms. Gauthier] over to where [Ms. Konigsmark] was" during an argument
regarding a student's choice of paper topic; (3) Ms. Konigsmark yelled at Ms. Gauthier
in front of her class; (4) Ms. Konigsmark undermined Ms. Gauthier's authority;
(5) Ms. Konigsmark questioned whether Ms. Gauthier could monitor a class with her
visual impairment; (6) Ms. Konigsmark told Ms. Gauthier not to talk to parents without
Mary Nichols or herself present; (7) Ms. Konigsmark told Ms. Gauthier to come to her
immediately if she needed an accommodation because of her vision so that Ms. Gauthier
would not be able to use the lack of accommodation as an excuse for failing her upcoming
evaluation; (8) Ms. Konigsmark made fun of Ms. Gauthier's handwriting; and

(9) Ms. Konigsmark instructed Ms. Gauthier's interpreter to leave the room only if there was another adult present with Ms. Gauthier. With the facts taken in the light most favorable to her, Ms. Gauthier still fails to demonstrate that she suffered an adverse employment action.

The court finds that Ms. Konigsmark's proposed, but not implemented, third year of mentoring does not rise to the level of disparate treatment. See Jeseritz v. Potter, 282 F.3d 542, 546-47 (8th Cir. 2002) (describing how claims of a conspiracy to discharge for a disability, without more, fail to demonstrate a pretext). Further, Ms. Gauthier's claims of continual harassment and humiliation are more properly addressed under her arguments regarding hostile work environment.

The court grants defendants' motion for summary judgment as to Ms. Gauthier's ADA and ICRA disability discrimination claims.

### D. Hostile Work Environment

Ms. Gauthier alleges that WCSD "should be held liable for the hostile work environment to which [she] was subjected because they failed to correct the hostile work environment after [she] complained about it." In support of her claim, Ms. Gauthier states that "[s]he was subjected to discriminatory comments, she was yelled at, grabbed and undermined in her job. She was made fun of, humiliated and embarrassed for her handwriting."

Defendants argue that Ms. Gauthier fails to establish that Ms. Konigsmark's purported harassment was severe enough to effect the terms, conditions, or privileges of her employment,

> Viewed in the light most favorable to Ms. Gauthier, the record shows no more than five remarks by Ms. Konigsmark relating to Ms. Gauthier's vision: two instances, one in February 2002 and the other of uncertain date, in which Ms. Konigsmark asked Ms. Gauthier how much she was able to see in the legitimate context of playground or classroom management; a conversation in November 2002 in which Ms. Konigsmark legitimately – commendably, even – told Ms. Gauthier that she should not hesitate to request any necessary adaptation for her

> visual impairment to ensure that she would be able to pass her
> final evaluation; and two incidents, one in the spring of 2002
> and other in March of 2003, in which Ms. Konigsmark made
> comments about Ms. Gauthier's handwriting.
>
> * * *
>
> To use Ms. Gauthier's own phrase, these incidents may
> constitute evidence of "bad principalship," but not
> discrimination.

Considering the totality of the circumstances and comparing this case to the facts in other cases in which the Eighth Circuit Court of Appeals has rejected harassment claims, Ms. Gauthier has not established a question of material fact as to whether the alleged harassment was sufficiently severe or pervasive as to affect a term, condition, or privilege of employment. Cottrill, 443 F.3d at 636. See LeGrand v. Area Red. for Cmty & Human Servs., 394 F.3d 1098, 1100-03 (8th Cir. 2005) (finding no objectively hostile work environment created by defendant's unwelcome sexual advances on three separate occasions over a nine-month period, including asking the employee to watch pornographic movies with him, hugging and kissing, and grabbing the employee's buttocks and thigh); Tuggle v. Mangan, 348 F.3d 714, 722 (8th Cir. 2003) (holding no actionable hostile work environment based on defendant's inappropriate sexual comments, taking a photograph of plaintiff's rear end and giving plaintiff undesirable work assignments); and Duncan v. Gen. Motors Corp., 300 F.3d 928, 933 (8th Cir. 2002) (holding no actionable hostile work environment where co-employee asked plaintiff if she would have a relationship with him, touched plaintiff's hand on four to five occasions, requested that plaintiff sketch a sexually objectionable planter, asked plaintiff to complete a task on his computer where its screen saver depicted a naked woman, hung an offensive poster, and asked plaintiff to type a document for him containing sexually offensive items). This court grants defendants' motion for summary judgment as to Ms. Gauthier's hostile work environment claim.

## E.  Retaliation

In order to establish a prima facie case of retaliation and survive summary judgment, Ms. Gauthier must demonstrate that she (1) engaged in a statutorily protected

activity, (2) that an adverse action was taken against her, and (3) that a causal connection exists between the adverse action and the protected activity." Mershon v. St. Louis University, 442 F.3d 1069, 1074 (8th Cir. 2006) (citing Amir v. St. Louis University, 184 F.3d 1017, 1025 (8th Cir. 1999).

Ms. Gauthier engaged in statutorily protected activity when she filed her initial complaint. However, she fails to establish that defendants engaged in adverse action against her in response. Ms. Gauthier alleges that after she raised her initial claim of discrimination with WCSD in March of 2003, Ms. Konigsmark retaliated against her by "yelling at her, grabbing her, undermining her authority and generally making her work environment miserable." Plaintiff's Response at 17. Ms. Gauthier also alleges that her transfer from teaching regular education 4th grade students at Kittrell to teaching ELL at Jewett constituted a retaliatory adverse action.

As addressed previously, this court found that Ms. Gauthier's general allegations of 'hostile work environment" fail, and similarly provide inadequate support for this retaliation claim. Regarding her transfer, defendants assert that there was nothing about WCSD's transfer of Ms. Gauthier from Kittrell to Jewett that could either be construed as discriminatory nor that would be deter Ms. Gauthier from exercising her statutory rights, and, in any event, there were legitimate, nonpretextual reasons for the transfer.

The court notes that "a transfer from one job to another is not an adverse employment action if it involves only minor changes in the employee's workings conditions with no reduction in pay or benefits." Fenney v. Dakota, Minnesota & Eastern R. Co., 327 F.3d 707, 716-717 (8th Cir. 2003) (internal citations omitted). Here, Ms. Gauthier simply alleges that the transfer was retaliatory, without specifying in what manner the transfer altered her pay, benefits, or working conditions.

> The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.
>
> * * *
>
> [A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this

> context means it might have 'dissuaded a reasonable
> worker from making or supporting a charge of
> discrimination.' " Rochon, 438 F.3d, at 1219 (quoting
> Washington, 420 F.3d, at 662).
>
> We speak of material adversity because we believe it is
> important to separate significant from trivial harms.

Burlington Northern and Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2414 -2415 (2006).

Ms. Gauthier must do more than label her transfer as retaliatory. Here, she failed to demonstrate injury or to show that the transfer was likely to deter a worker from engaging in statutorily protected activity. After the transfer, she personally filed a complaint in this court alleging discrimination. Because Gauthier has not established her prima facie case, this court grants summary judgment as to her claim of retaliation under the ADA and ICRA as to both defendants.

### F. Defendant Konigsmark's Individual Liability Under ICRA

Ms. Konigsmark asserts that as she had no control over WCSD's hiring decisions, she is not subject to individual liability under Iowa Code. citing Nelson v. Wittern Group, Inc., 140 F. Supp. 2d 1001 (Iowa 2001) (court finds that "before an individual may be found liable under Iowa civil rights law, he or she must be found to have control of the company's hiring decisions" Id. at 1009); Erickson-Puttmann v. Gill, 212 F. Supp. 2d 960, (N.D. Iowa 2002) (court finds that holding in Nelson was "in keeping with the express language of Iowa Code § 216.6 (1)(a) which limits discriminatory acts to acts which imply that the actor has decision making authority over employment actions." Id. at 975-976).

Ms. Gauthier contends that Ms. Konigsmark is subject to individual liability because

> Ms. Konigsmark's review of her performance [] would
> ultimately determine whether Ms. Gauthier would remain as
> an employee of the Waterloo Community Schools. Thus for
> the Defendants to assert simply that because Ms. Konigsmark
> did not directly hire or fire employees, she cannot be subject
> to liability as an individual skirts the issue of her supervisory
> authority.

Plaintiff's Brief at 18.  Ms. Gauthier's argument concedes that Ms. Konigsmark did not have the ability to hire or fire Ms. Gauthier.  As such, this court grants Defendant Konigsmark's motion for summary judgment as to the issue of her individual liability under the ICRA.

Upon the foregoing,

IT IS ORDERED that the defendants' motion for summary judgment (docket number 31) is granted.  The Clerk of Court shall enter judgment in favor of defendants and dismiss this case with prejudice.

February 23, 2007.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT